1-4-1-4, Cincora Guarantee is open at all for the City of Detroit Commission. Our responsibility is to respond to Mr. Landau's request. Thank you, and may it please the Court. I'm Chris Landau, and I'm here today for the appellant, Cincora.  This dispute involves an elaborate lockbox system established in 2009 to limit Detroit's access to the casino revenues and prevent precisely what's happened here. The bankruptcy court essentially nullified that arrangement, holding that the revenues in the lockbox are property of the estate subject to the automatic stay. Well, you would agree, though. I mean, let me kind of just cut to what I think is in dispute here, and you can tell me if you disagree. It would seem that this is clearly property of the estate. It's just the question is, what are the extent of those property rights that the city enjoys? And really the dispute here is not whether it's property of the estate, but whether this revenue stream should be held in the, I think it's the general revenues account, just indefinitely, or whether it should flow through the lockbox in the ordinary course. Is that really what we're arguing about here? Yes, Your Honor, I think that's a good way of putting it, to put a slightly different point on it. The city retained a contingent right to receive the revenues if and when certain conditions were satisfied. How real beef here is that the bankruptcy court's holding with respect to the automatic stay transformed that contingent right into a non-contingent right to start receiving those funds automatically. In other words, to open the lockbox. But what it puts you in is the ordinary course lockbox scenario, right? Not the trap scenario. I.e., once the city makes the payments called for to the swap counterparties, as I understand it, then U.S. Bank can release funds from the general revenues account, right? So it's the non-default scenario that's described in the collateral agreement, not the default scenario. Well, and then the collateral agreement also describes a default scenario, which is what has been triggered here by the events of default and termination events that led to the cash trap being triggered. But your argument is we should be in the default scenario under the collateral agreement, not the non-default scenario. Yes, Your Honor. And that's what this boils down to. And I don't think there's any disagreement or dispute. In fact, the bankruptcy court specifically held in the eligibility order from last December 5th that there were events of default and termination that triggered the cash trap feature of the lockbox. I'm struggling to understand. Your appeal here is to the decision of the bankruptcy court that those casino revenues are property of the debtor, right? Yes, well, that the automatic stay applies to basically force open the lockbox that would otherwise be slammed shut. Well, was that decided by the bankruptcy court in the order that's before us? What the bankruptcy court said was this is property of the debtor. Therefore, you may not go outside the bankruptcy court and challenge the use of it. So I'm not understanding how we get to anything beyond the question of whether you are able to The bankruptcy court was able to do what it did by defining the property of the debtor. The property of state issue and whether or not the money in the lockbox is subject to the automatic stay is distinct from the default issue, I think, that Your Honor is raising. And there was a dispute about the default issue before Detroit filed for bankruptcy that they had gone in for an ex parte TRO from the state court. That then was removed to the bankruptcy court. And so that had been So the bankruptcy court effectively said, take it up here. Well, the bankruptcy court essentially mooted that dispute by basically saying it doesn't really matter whether there was an event of default because essentially the lockbox has to remain open anyway. So basically the practical effect of the bankruptcy court's order that the automatic stay applied to the lockbox forced the lockbox to remain open. You know, there seems to be implicit in all this some belief that the automatic stay affects your client and perhaps the swap counterparty differently from the way in which the automatic stay affects other parties. But, I mean, an automatic stay has consequences that affect many parties. Am I misunderstanding the way you phrase that or not? I hope I didn't phrase it inelegantly or even worse than that, Your Honor. Well, I might have heard inelegantly. Okay, well, I doubt it. I suspect it's the way I put it. But certainly the point here is that these revenues, this whole elaborate lockbox system was created precisely to keep these revenues beyond Detroit's grasp in exactly these circumstances. And that's really the irony here. In the event of bankruptcy? Well, in the event that it was not able to satisfy its financial obligations. It was basically almost... What has happened during the pendency of the bankruptcy with respect to the payments? Well, the... I mean, we know that what's in the lockbox comes into the bankruptcy estate. But what arrangements have been made, if any, that affect the going out of money? Well, Detroit has paid its swap obligations. But that doesn't mean... They seem to suggest that that means somehow that they're all hunky-dory under the lockbox. The event of default and the event of termination that were deemed to slam the lockbox shut are not limited to the nonpayment. What was it? Just remind me. I mean, I've read this, but what was it that triggered the default again, in your view? There were several things. There was an event of default, which was the nonpayment of service certificates. There is a master agreement. There is a cross-default provision that says that that's a default under the swap agreement, too. And then there were two separate events of termination. One was the declaration of a financial emergency, and one was the appointment of a financial manager, the emergency manager. Those are undisputed. And I think, going back to Judge Stranch's earlier question, subsequent events, in a sense, have kind of caught up with this case in the bankruptcy court. I mean, as you pointed out, this dispute about property estate and the application of the estate was decided right at the outset. But then as... But that's the order that is before us. Correct. So that's what we're here about. Correct. And that order remains before you? Just in terms of the practical consequences of that, I just wanted to mention that in the subsequent proceedings that have happened, particularly in the course of the swap settlement appeal that is coming down the pike, it's here as well, and I realize that's separate. That's a separate issue. Absolutely. I understand why you might... But today, we're here about what the bankruptcy court did. Right. I have one more piece that you need to educate me on, if you would. I'll try my best to. I just... I want to understand exactly how this swap relates to your situation. So let me just walk through and correct me where I'm wrong, okay? Okay. We've got this 2006 swaps contract. It was for the purpose of converting a floating rate into a fixed rate, right? And that was applied to the 2006, I think, B COPS. Is that correct? Yes. Okay. But that's not all of them, right? Right. There are different swaps that apply to different COPS. Sure. So some of... I'm trying to understand the payment system in the back so I can understand where we are today. So the city was making separate payments. It was making payments on the 2006 swap contracts, which was not all of the swaps, not all of the COPS, but a part of the 2006 COPS. And payment on the 2005 COPS separately. So you've got a swaps payment and you've got a 2005 COPS payment. Am I getting it? Yes, Your Honor. I believe that's all correct. All right. Swaps and COPS payment. And then there was a 2009 collateral agreement. Right. And the collateral agreement concerned only the 2006 swaps. Correct? Now that, again, my understanding and... Because that was all that was floating. Certainly, the collateral agreement modified the swaps agreement. I had thought, I believe that the answer is that for every COPS, there is a corresponding swap because I had thought... I thought that, were there any swap agreement for the 2005 COPS? I think not. Your Honor, as I stand here, I can't answer that question. I can look when I sit down. But my understanding has always been that all the certificates were floating and that there were corresponding swaps for the corresponding certificates, basically to make them, as you said at the outset, from floating rate certificates into fixed rate certificates. And that, therefore... But the payments were separate. There's this one. Correct. Stream of payments on the 2006 swaps. Correct. And then a stream of payments on the second 2005 swaps. And so in June of 2013, the city missed a COPS payment. Yes. Yes. And this goes back to the point I was discussing with Judge Ketledge that the missing of a COPS payment is an event of cross default under the swaps, which then triggers the lockbox to close. That's in the is the master agreement. It's cross reference if you go back to the collateral agreement. That's defined as an event of default. So basically, by missing that COPS payment, that caused the lockbox to start trapping under the collateral agreement, even though there was no missing of a swap payment. Let me ask you quickly, since your time has expired. Ordinarily, if a party takes the position that somebody is not the owner of property, it would be obvious who the competing owner might be. There really is not a viable competing owner here. I mean, property belongs to someone. And I understand there's something about... I think there was something in one of your briefs about the bank. But the bank can't be said to be the owner of the funds. I agree, Your Honor. But who's the competing owner? Well, Your Honor, it's an escrow situation. And what an escrow situation does is ownership... Well, escrows don't deprive people of ownership. Escrows limit by agreement the way in which funds can be used. But they don't negate ownership. Fair enough, Your Honor. But the point is... But who's the competing owner? Well, I guess the point is, Your Honor, an exclusive focus on ownership misses the point that we're talking about sticks in the bundle. In a sense, they've alienated some of the most fundamental attributes of ownership, which is the right to possession and control, to access those funds. They basically said, we are... But there are many, many, many situations in which a party continues to own property but gives up the right to control it at a given time. You know, you can have bailment situations. You can have many, many situations. Sure, but that's why... You know, you have leases. I mean, all kinds of contracts that substantially interfere with ownership rights but that are chosen by the owner. Well, I think that's why we relied so heavily on the escrow cases, which... Well, the answer is there's no competing owner, right? Well, the answer is that you... Ownership is, in a sense, in stasis, I believe is the word that is used in some of the New York cases. In a sense, they have... The grantor has the ownership. But in a sense, they have alienated some of the most fundamental aspects of their...  But the city has allowed its ownership rights to be so limited that it's no longer the owner for purposes of being within the bankruptcy code. And you don't tether that to the bankruptcy code in any way. Instead, you tether it to New York law. Correct, Your Honor. And so we're really relying on the escrow cases. And those recognize that under certain... I get that. Can I ask a couple questions? Mr. Landau, it seems like a premise of your argument is that the operation of the trap is automatic upon an event of default. And when I look at the collateral agreement, and specifically Section 5.8, it doesn't seem to me that it is automatic. I mean, that section, I'll just read it briefly. For purposes of the custodian, the bank, determining the amount or timing of payments to be made under this Article 5, the custodian may rely upon the written notice delivered by either counterparty, of which your client is not one, I believe, as to the occurrence of any... And then we'll just say default. And so why isn't the best reading of this that the trap is not automatic but that upon an event of default, one of the swap counterparties, if they so choose, can invoke this fairly draconian remedy and direct the bank, give the bank notice to trap? Now, I mean, that seems to make sense linguistically. It also would seem to make sense economically because in that event, the swap counterparties could work out some remedy short of something so draconian with the city, which I believe they, in fact, have done. And so why isn't that the best reading, that it's not automatic? And as I'm sure you know, if it's not automatic, you start getting in trouble with the stay once there's a filing. Your Honor, first of all, we triggered this before the stay. So let's just be clear. Well, that's my second question, whether you're entitled to. Right. But would you agree that the trap does not happen automatically upon an event? I wouldn't, Your Honor. You would not agree with that? Okay. I would also not agree respectfully with your initial statement that the premise of our argument is that this is automatic. Okay. Well, that's why I'm asking. So tell me why you think that's the statement. Well, I think the part you read says the custodian may rely. Right. It doesn't suggest that that is the only basis. That basically says, yeah, if somebody comes to the custodian, the custodian may rely. Is there any other language that says the custodian has an affirmative duty to impose the trap? And please don't shake your head at the council table. It's distracting, and you don't have your turn. That the custodian has an affirmative duty to impose the trap upon an event of default. Yes, Your Honor. We think it's automatic under Section 5.4. It just says, when payments from general receipt subaccount prohibited, no payment shall be made to the city from the receipt subaccount on or after the occurrence of a termination event. That doesn't say upon notice by a counterparty. So I think notice by a counterparty may be a way to trigger, but I think 5.4, as I read it, seems to signal that it's automatic. Okay. Well, that's a helpful answer. But under the hedge language, alter that? I'm sorry, I just want to understand your argument completely. I'm sorry, Your Honor. You're talking about when payment, you're talking about 5.4 when payments from general receipt subaccounts are prohibited? Yes. On or after the occurrence of a termination event under a hedge. And things like the appointment of an emergency manager or a termination under a hedge. So that's when that would be triggered automatically. But if I could just finish my answer to Judge Ketledge. And I think maybe Judge Ketledge also had another question. Well, I mean, the only thing I wanted to ask is, why are you entitled to do this? Having said that, I'll relax. I appreciate the opportunity to do this. The bankruptcy court suggested, and the other side certainly argues, that we have no rights under the collateral agreement and that that's the beginning and the end of the story. I think as we said in our reply brief that we filed just last Friday, that kind of misses the entire structure. The collateral agreement doesn't purport to be some freestanding agreement that exists independent of everything else. To the contrary, the collateral agreement by its terms says, in Section 14.14, this is part of this overall network of agreements. And it talks about insurer's rights and it talks about things like that. So the point is, we don't need the rights to flow from the collateral agreement because we already have the rights that flow under the pre-existing contract administration agreement, which is the kind of meta-agreement that governs these whole transactions. So I'd send you back, Judge Ketledge, particularly in response to your question as to what right we would have to direct these people. Two provisions I think are particularly important of the contract administration agreement. Section 9.2 that specifically says that an insurer... I'm sorry, what agreement are we talking about? This is called the contract administration agreement, and this was in the bankruptcy court as document number 366-5. That's different from the swap schedule? Yes. It's a separate agreement? It is. This is actually... The swap schedule was the amendment to the swap agreement that kind of accompanied the collateral agreement. It helped weave the collateral agreement. I'm sorry this is so complicated. No, I'm hanging with you. I'm trying. I appreciate you're hanging in there because this is not easy stuff. We're all lawyers. It's to the complexity. We're pretty accustomed to complexity. It's to the, you know, every answer, typical of counsel, not only you, but every answer ends up being generally more complicated than it needs to be. No, no. Go ahead. That's where my question is. While you answer, Judge Cathledge, you know, including that, just to me is a kind of practical common sense thing. You agree that there are separate swap payments from COPS payments. There is a default on a COPS payment. Correct. And you want to come in and go after a lockbox that's designed to insure payment on the swap contracts only. So I'm struggling a little bit with how you can dance through the document to show to all of us your ability to take a COPS payment issue and convert it into rights under a swap agreement. Specifically with respect to that, Your Honor, I'd refer you to the ISDA Master Agreement, which is document 366-4 from the Bankruptcy Court docket, and that's called Events of Default and Termination Events. So that is page 5 of 40 there. What does the relationship, remind me again, between this master agreement and the collateral agreement? Because you have some documents that are incorporated by reference and some that are not. Yes. The collateral agreement, definitely in section 14.14, it talks about the agreements that it's modifying and that remain in effect, and it refers back to these. That's section 14.14 of the collateral agreement. So sorry about this, but this has a cross default that links the default under the COPS to the swaps. And then the contract administration agreement, section 9.2 and section 6.9.2, specifically give us the right to direct and control the actions of the swap counterparties. Okay. Were everyone's questions answered or are there remaining questions? Yes. All right. You'll have your rebuttal time. Thank you, Your Honor. Ms. Ball? Thank you, Your Honor. I apologize. Oh, that's okay. It was inadvertent. I know. I know. Don't worry about it. I am, for the record, Corinne Ball of Jones Day, appearing for the city of Detroit. And I wanted to point out, in light of your questions, two concepts, and perhaps you can direct me as to which would be more helpful to you. I seem to detect from your questions that we are talking about, on the one hand, enforcement of the collateral agreement, and on the other hand, just the scope of the protections arising on the commencement of a Chapter 9 case in bankruptcy. Those protections, that was the question that Judge Rhodes had to address. Do the stays that arise on the commencement of Chapter 9 enjoin SINCORA from sending notices or taking steps to cause the custodian to withhold revenue? Well, they started to do that before. It was no bankruptcy at that time. Right, right. That's not really the issue before us. I mean, the issue before us, at the end of the day, I mean, the agreements are relevant in terms of defining the interest, but the big picture issue before us today is whether this revenue stream is property of the city. And so I'm not sure that, speaking for me, I think an understanding of the overall agreement is critical. But I think it would be easy to get lost in them. So don't get lost there. Perhaps that context might be helpful. Judge Chong, in answer to your question, you're absolutely correct. There are differing issues of COPS, and only one of them has SWAPs affiliated with it. There are COPS payments and there are SWAP payments. In 2009, with the financial crisis, there was a major default under the SWAPs. That default was the failure of Sincora to be creditworthy. That default threatened the city with an acceleration of its obligations under the SWAPs. To prevent that consequence, the city provided separate credit support to the SWAP bank counterparty. That separate credit support was the collateral agreement. I would disagree strongly that Sincora has any rights under that agreement. In fact, it was Sincora's default that caused the execution of that agreement. But I understand Sincora's position. It must be that the labeling of Sincora as a third-party beneficiary in a separate agreement somehow gives it rights under this agreement. Is that your understanding, or is it something different? That's my understanding of their argument, but I would suggest, Your Honor, that when these parties wanted someone to be a third-party beneficiary, they expressly provided for it. They didn't do it in 2009, and I don't think that's surprising. Why would the city make the cause of the problem a beneficiary? In fact, the city pledged one of its core assets, asset worth. Is your assertion that Sincora caused the default, is that in the record? Yes, in 2009. That was the reason. I mean, where would I look in the record just to, you know, if I wanted support for that? It's in the transcript of August 21. Okay, that's what I would call a secondary source. Secondary source. Is there any primary material that shows that something about Sincora's creditworthiness triggered the default? I mean, we don't have to get derailed on this. If you have it handy, great. If not... I will think about where it is. Okay. Don't let me interrupt. In answer to one of your other questions, I also wanted to point out, when these parties wanted to incorporate by reference, they were very specific. And in our brief, we cited multiple examples where that was actually done. Here, we're talking about, and I think this gets back to your point, Judge Gibbons, there was a lack of credit. The city provided collateral. The city entered into a garden variety secured financing. Well, let me stop you there because, I mean, usually with a security agreement, and here I'm speaking, I guess, generally, not just ones that relate to cash, the debtor or the lendee does not surrender possession and control of the collateral, right? Cars, houses. Cash is unique in that respect, Judge. If, in fact, in this lien, only applies to the cash, the way the UCC directs parties to perfect a first priority lien on cash is by possession and control, frequently done through a deposit control agreement. But in order to perfect that lien, you do have a third party taking possession of the cash. You're saying it's a classic cash security arrangement. Yes, Your Honor. Okay. And I think that's consistent with provisions of the agreement, and I also have wanted to point out another answer to your question, Your Honor, on the duties of a custodian. Before you step into that, does the record not reflect, and I'm remembering this incorrectly, that Sincora's downgrade was an issue of default? Was that part of the default? Was that not an event? I thought that was, in accordance with your argument, one of the default provisions, which is why the city had to come in and offer its casino revenue, is because one of its major insurers had itself resulted in an event of default. Yes, Your Honor. And there was another one, which is in Sincora's papers in 2012, an additional downgrade. There were then the defaults in March. Yet throughout that period, until Sincora took action, the collateral agreement and the lockbox operated as it always has. It was only when Sincora sent a notice that there was any interruption. Yet there had been exigent defaults for some period. So tell me again what, in your view, were the events of default, as defined by the collateral agreement, and when those happened. There was an event of default in 2012 by virtue of additional downgrades of the swap insurer. There was an event of default when the governor declared a state of financial emergency. When was that? In February of 2013. There was an additional default when the governor appointed Mr. Orr as the emergency financial manager. March. At the end of March 2013. Okay. Was the October 2008 Sincora downgrade, this was prior to that? That was prior to and one of the swap insurers. I mean, while we're on the specific point then, what is your response to Mr. Landau's point about Section 5.4 of the collateral agreement, which I brought the wrong pile of primary documents. I brought it for arguments we're not having. So I don't have that section in front of me, but as he read it, it did sound, arguably, like the default event automatically puts the trap in place. And what is your response to that? As an interpretive matter. As an interpretive matter, Your Honor, I think as with any other age custodial relationship, you need an instruction. Custodians don't act independently. You're reading a 5.8. I think it's accurate. And I think it's even more supported by all of the provisions of Section 12 of the collateral agreement. Section 12 spells out exactly what rights and responsibilities the custodian has. And frankly, absent a written instruction, it is not protected in doing anything. So I believe it was the intent of the parties that made obvious through 5.8, in conjunction with Article 12, in particular 12.2, the duties and responsibilities of the custodian. Why would they have to repeat that if hypothetically Section 5.4 or some other section said, in the event of a default, all revenues shall be trapped in the general revenue account, period? Why would they have to repeat in Section 12 and the custodian has to do it? Because they also provide an agreement that the custodian has no independent duty to ascertain whether or not there has been an occurrence of a default. Okay. It has no independent duty to act. Again, it's in Section 12. Okay. And the custodian is not liable for any action taken or omitted, as long as it's relying on the instruction of the counterparties, who are the secured parties. Thinking about the way this agreement works, that section also, I would spend a minute on Section 12, that's also the provision in the collateral agreement where the agreement disclaims any fiduciary duty. It's one of the provisions of this agreement that is inherently inconsistent with any concept of the escrow. The other obvious position that we believe is absolutely contrary to common sense and the fundamental premise of an escrow is there is no competing party. If you look through this entire agreement, SINCORA cannot point to one section which directs delivery of this property to any third party. Why does it matter? I mean, who cares if it's an escrow? I mean, aren't we just focused on what were the rights, regardless of what label we put on the package, what were the city's rights as of the date of filing and is what SINCORA is arguing now, would that effect a change to them in violation of the stay? I mean, why do we have to worry about the label of escrow? I think we only worry about it because right now SINCORA stayed from taking any action to alter the ordinary court's absent relief from the court. It could go. No one is saying it couldn't go to the bankruptcy court and seek relief from the stay. But the one fact that's very troubling here, and I hesitate to raise it as a substantive response, but the entire issue of SINCORA's right to enforce the collateral agreement is the subject of another decision by the bankruptcy court in which SINCORA, the city, the banks, and all appropriate parties participated. There was a full record, and the bankruptcy court determined that SINCORA was neither a third party beneficiary agreement, not a lien creditor, and had no right to enforce. I understand that that opinion is on appeal. But those matters have already been fully briefed in a separate proceeding. Back to what's here today is the city is receiving its tax revenues every day or two weeks in every month, as it has since the collateral agreement was put in place. That has only been interrupted for a short period when there was a notice from SINCORA. Right now, the automatic stay, and on the day the city filed, that was the case. It was getting those revenues every day. Whiting Pool is quite clear that even a secure party in possession is subject to the automatic stay. This was an issue that Judge Bennett had to deal with in the Jefferson County Chapter 9 case. The automatic stay still applies. Parties can seek relief from it if they're not adequately protected. Here, it's hard to imagine a situation when the revenues that come into this account are four times the monthly payment, and we have SINCORA, whose total liability, should the banks ever terminate the swap, is capped at $27 million. I'm not surprised they didn't ask the Bankruptcy Court for relief from the stay. Let me ask you this question. Let's say, after one of these events of default, one of the swap counterparties gives notice to U.S. Bank, imposes the trap, U.S. Bank imposes the trap, city then files. You would agree that after the filing, the city does not then have those funds liberated by operation of the stay? The stay is just a freeze. I absolutely disagree with you, Your Honor. I think I was in court on day one seeking to use those funds because the parties were adequately protected. Well, that's a different argument, but that's a wholly different argument. That's not an argument that the monies are not subject, in the first instance, to the automatic stay. It's an argument that an exception to the stay. I'm just... No, it's saying that in bankruptcy, Your Honor, if I may... Let me ask my question. Let's say, hypothetically, they weren't adequately protected. Would you agree then that... The automatic stay is conditioned upon providing. So, I mean, it just really depends on whether the trap legally, as an initial matter, or whether there was a legal right to impose the trap, and what was the status quo as to the date of filing. How do you reconcile that position, which is just a secured way of exercising remedies? He gets to ask the questions, Your Honor. Let me ask another question. The automatic stay operates the stay proceedings against the debtor, right? Among other things, yes. Okay. To what extent the debtor's... I am no bankruptcy expert, okay? But the debtor's ability to act is more typically, I believe, limited by other things, like what actions the bankruptcy court will approve and not approve, than it is by the automatic stay. Is that correct or not? That is correct, Your Honor, and it actually... Well, I'm not even sure, I mean, I'm not even sure that it would be the automatic stay that would preclude the payment of the swap counterparties. If anything precluded that, it would seem to be the action of the bankruptcy court. Is that correct or incorrect? I'm hesitating because the swap counterparties have always been paid timely. There's never been a missed payment. And nobody's ever gone to ask the bankruptcy court for permission to pay. No, because with secured creditors in bankruptcy, that is an exception. You can use collateral, you can pay secured creditors. So the bankruptcy, so the city is able to continue to pay out of funds other than the funds that are held and thereby obtain the release of the fund, right? Yes. So the automatic stay is really not what's in operation there. Yes, because the automatic stay, Your Honor, is one word you just bear with me and think about what happened in Jefferson County. There you had all the assets of the county sewer system. All the cash collected was in the possession and control of a receiver appointed by the secured creditors. Under reliance on whiting pools and the automatic stay, Jefferson County removed the receiver, got their property back, but did have to adequately protect the secured lender. So if the situation here had been- I think my question was a more fundamental and a factual one that just goes to our understanding of what was going on in this case. And I think you probably answered the question I had, but are there other questions? The Honor, I'm just checking this section 12.3 relative to the rights of the custodian. Simply put, the provisions there relate to representatives and actions of the counterparty. That's your position and not an insurer, right? When the agreement meant insurer- It said insurer. When it said counterparty, it said counterparty. Okay, thank you. Are there any further questions? No. Thank you. All right, Mr. Landau, did you reserve some time for rebuttal? I just didn't write it down.  If I could very quickly, I'd like to make three points on rebuttal. Quick question. Twenty-seven million is the cap of your liability, correct? Of concourse liability. No, we have quite a lot. It's about $400 million in liability when you- And what is the agreement that's in concourse total exposure with respect to the swaps contract, which is what we're talking about, is capped at $27 million for the swaps contract, which is what we're on? My impression is that that is much greater than that, that we're talking about somewhere around $100 million on that. But I don't have that at my fingertips. I'm sorry, go ahead with your response. Actually, and you're- just to clarify one point earlier, you are absolutely correct that not all of the certificates were floating rates of swaps don't apply to all the cops. Hence, there were two lines of payment. Hence, my concerns about- We can submit a supplemental letter just to clarify exactly how that shook out. I apologize for that. Mr. Landau, I know you have your three points, but I've got to ask you a question, all right? Okay. I mean- Can I still make my three points after your question? It's up to the presiding judge. I don't want to overreach my bounds. Get on with the question. All right. Why- No, that's all right. That's all right. Why isn't it fatal to your argument here that the fact- Why isn't the fact that the monies were flowing on the date of the filing? I know you tried to stop that, but there was a TRO. As a factual matter, the monies were flowing through the lockbox on the date of the filing. There is case law that says the stay maintains the status quo. Explain to me why that doesn't defeat your argument. The status quo, that stay was just a TRO for 10 days. In other words, that expired long ago by its terms. Would you hang your hat on the expiration of the TRO? Is there anything other than the temporary nature of the TRO that you point to? The TRO, again, I think the point is what is really keeping open the lockbox is the automatic stay. I don't think there's any question that that was the whole point of this ruling. Why is it the automatic stay if, in fact, what's occurring here is that there is compliance with the agreement?  That's the point, Your Honor. I think actually opposing counsel's argument underscored that there were events of default and events of termination under the underlying agreement that triggered the cash trapping. Opposing counsel keeps insisting that Detroit— But that could have triggered the $300 million in termination payments, and it didn't. What it can trigger is different from what it does. And so what you have here is there were events of default. They didn't trigger the termination payments. That was the whole reason that we have the deals going on that we have now. So what you've got is an agreement that is being fulfilled. The payments are being made. Why can't that go forward? And the only thing that the stay does is prevent you from going somewhere else to stop it. There are events of termination and default. Now, we're talking about under the collateral agreement. So the collateral agreement is what sets in effect the lockbox. Those events of termination and default are what shuts the lockbox closed. And other than that TRO, which expired by its terms, the lockbox would be closed. It's the TRO. Excuse me. It's the automatic stay that is upsetting the status quo and keeping the lockbox open. I don't think there's any real question. But it was open. Only because of the TRO. And, again, that wasn't a conclusive determination of anybody's rights. That happened to be an ex parte thing. And if you look at the TRO. Why don't you, if you want to make your three points, make them in one sentence. State only the conclusion. Do not. Lots of commas, but do no rabbit trails. One sentence. The first point is that our rights are not contingent here on rights under the collateral agreement as opposed to pre-existing rights under the earlier agreements under which we conclusively. That's point one. Point two. Point two was basically the point we were just discussing. That the automatic stay here is what actually is forcing open the lockbox and keeping it open and allowing all this money to go into the estate. Other than that, it would be closed under the automatic trapping provisions. And three is that we are very grateful to be here today to make these arguments. We know that it took action by your honors to allow us to. I have a number four question. I'm on section 5.4 of the collateral agreement. When payments from general receipts subaccount prohibited. This is the trap part that you're talking about, Ron. How do you account for A2? A says no payment shall be made to the city from the general receipts. No payment. That's the trap. Number two. On or after the occurrence of the termination event under a hedge where the related counterpart is not the sole affected party except as otherwise permitted by subsection B. Subsection B says no payment shall be made to the city from the general receipts subaccount on or after a qualified hedge event unless and until one, the city enacts the correlative supplemental appropriation, which we've been told is going on. Two, the finance director delivers to the custodian and the counterparty certification that such supplemental appropriation has been duly enacted and is in the amounts required by this agreement. Aren't you within the exception? I don't think so, Your Honor. How not? On or after the occurrence of a termination event under a hedge where the related counterpart is not the sole affected party except as otherwise permitted by subsection B. I don't think there's been any determination that subsection B is what has been fulfilled. What you're saying is a trap is a trap forever. I'm suggesting to you that here is language that says a trap is a trap forever until the city pays up and the city's paid up. So why are you not in the exception to the trap? Let me say this, Your Honor. Again, there's little two, which you're reading from now. There's also little three, which is while an event of default is occurring. And there was an event of default separate from the termination event. But that's an or. What's that? Number three is an or. There are three either or options. Right. Under number two, it says you are trapped until what happens? This happens unless, and then B tells you what the unless is, and I understood your opposing counsel to say the unless is payment of the appropriations and that's being done. No, Your Honor. I think that this is what opposing counsel says. I understood it. It's just that they are making their payments under the swamp. And why does B not say the city provides the supplemental appropriation, it provides the appropriation, delivers it to the custodian in the amounts required by the agreement? Isn't that what happened? No, Your Honor. This is a different, this is like a complete cure of everything. This is not just the payment under the swamp. What do the payments that have been made here lack to meet this requirement? Certainly the payment of the cop has not been cured. The certificate. And, again, that is an event of cross-default under the swamp. It's a little hard to know how the default under the certificates of participation might affect whose property this is. But, nevertheless, I think we're done. And we appreciate very much the argument that both of you have given and we'll consider the case carefully. Thank you. Thank you, Your Honor. Thank you.